IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

EDWARD JACKSON,

        Plaintiff,

v.                                                                       Civil Action No. 2:04-CV-81

JO ANNE B. BARNHART,
COMMISSIONER OF
SOCIAL SECURITY,
        Defendant.

## **REPORT AND RECOMMENDATION**
## **SOCIAL SECURITY**

### I. Introduction

A.    <u>Background</u>

Plaintiff, Edward Jackson (Claimant), filed his Complaint on November 1, 2004, seeking Judicial review pursuant to 42 U.S.C. § 405(g) of an adverse decision by Defendant, Commissioner of Social Security, (Commissioner).[1] Commissioner filed her Answer on February 11, 2005.[2] Claimant filed his Motion for Summary Judgment and Memorandum in Support on May 9, 2005.[3] Commissioner filed her Motion for Summary Judgment and Memorandum in Support on June 9, 2005.[4]

B.    <u>The Pleadings</u>

---

[1] Docket No. 1.

[2] Docket No. 3.

[3] Docket No. 7.

[4] Docket No. 8.

1. Claimant's Motion for Summary Judgment and Memorandum in Support.

2. Commissioner's Motion for Summary Judgment and Brief in Support.

C. Recommendation

I recommend that Claimant's Motion for Summary Judgment be DENIED, that the Commissioner's Motion for Summary Judgment be DENIED and that the case be REMANDED. On remand, the ALJ should provide a review of Dr. Gobunsuy's report and provide the reasons for his factual findings.

## II. Facts

A. Procedural History

On June 11, 1999, Claimant filed for Disability Insurance Benefits (DIB), alleging disability since July 12, 1995. The application was denied initially and on reconsideration. A hearing was held on August 24, 2000 before an ALJ. The ALJ's decision, dated September 29, 2000, denied the claim finding Claimant not disabled within the meaning of the Act. On May 10, 2002, the Appeals Council ordered the case remanded for consideration of new and material evidence that was not made a part of the file prior to the ALJ's decision. On remand, a hearing was held before a different ALJ on March 19, 2003. On April 16, 2003, the ALJ issued a partially favorable decision, finding that Claimant was disabled from July 12, 1995 through April 1, 1999, but not thereafter. Claimant requested review of the ALJ's decision, which was denied by the Appeals Council on August 27, 2004. This action was filed and proceeded as set forth above.

B. Personal History

Claimant was 41 years old on the date of the April 16, 2003 hearing before the ALJ. Claimant has a high school education and past relevant work experience as a tree trimmer and night

watchman.

C.     Medical History

The following medical history is relevant to the time period during which the ALJ concluded that Claimant was not under a disability: April 1, 1999 – December 31, 1999.

**West Virginia University Department of Orthopedics, 04/06/1999, Tr. 186-187**
ASSESSMENT: "Edward Jackson is progressing along about as expected. I think he has made improvement in his left C7 radicular complaints which is the thing we can help most with. He still has some neck and left trapezial pain, and I suspect it will be a permanent component of this."

**Preston Memorial Hospital, 04/12/1999, Tr. 191-192**
IMPRESSION: The neck pain appears chronic and the limited range of motion is likely to be permanent. The problem is readily exacerbated by any heavy lifting and seems to get worse with physical therapy. He is doing somewhat better with home range of motion. He could return to some form of work with a very limited duty including no lifting, no neck extension, no prolonged standing and no climbing.

**Radiology Report, 03/19/1999, Tr. 193**
IMPRESSION: A fusion C 5-6 disc space and degenerative C 6-7 disc disease. Degenerative disc disease upper lumbar spine and normal variant findings seen mid and lower lumbar spine.

**Preston Memorial Hospital, 03/18/1999, Tr. 194-195**
IMPRESSION: "Mr. Jackson has had cervical diskectomy and fusion at two levels and will be permanently limited in terms of his neck extension. It will not be possible for him to return to tree climbing which involves a considerable amount of neck extension.

**Preston Memorial Hospital, 01/14/1999, Tr. 196**
IMPRESSION: Steadily improving cervical radiculopathy.

**The James H. Wiley Medical Corporation, 06/21/1999, Tr. 206-210**
IMPRESSION: cervical spine sprain type of injury, cervical disc displacement with radiculopathy C5-C6, status post surgical fusion, cervical disc displacement with radiculopathy C6-C7, with cervical discectomy and fusion

**Residual Physical Functional Capacity Assessment, 07/07/1999, Tr. 211-218**
EXERTIONAL LIMITATIONS: occasionally lift and or carry 20 pounds, frequently lift and or carry 10 pounds, stand or walk (with normal breaks) about 6 hours in an 8-hour workday, sit (with normal breaks) about 6 hours in an 8-hour workday
POSTURAL LIMITATIONS: occasionally: climb, balance, stop, kneel, crouch, crawl
MANIPULATIVE LIMITATIONS: limited: reaching all directions

ENVIRONMENTAL LIMITATIONS: Avoid concentrated exposure to vibration

**Preston Memorial Hospital, 12/16/1999, Tr. 236**
IMPRESSION: Chronic low back pain and neck pain. In the low back there are radicular symptoms radiating down both lower extremities in what clinically sounds like L5-S1 pattern. However, the disc is only on the right side involving the L-4 root. The Dr. questions whether this disc is symptomatic and is cautious about recommending surgery. The EMG on the right side was negative.

**Preston Memorial Hospital, 10/25/1999, Tr. 238**
IMPRESSION: Left cervical radiculopathy with persistent pain. In the last three or four months a definite radiculopathy has developed. EMG did not localize the problem, however, MRI demonstrates a problem at the L4 root level.

**Radiology Report, MRI/Lumbar Spine, 10/18/1999, Tr. 239**
IMPRESSION: Focal far right lateral disc herniation at L4-5.

**Preston Memorial Hospital, Neurology Revisit, 09/20/1999, Tr. 240-241**
RESULTS: All muscles were silent at rest without fibrillations, positive sharp waves, nor fasciculations. Motor unit potential showed only a mild increase in poly phasic forms for the peroneus longus. Recruitment patterns were adequate.

**Preston Memorial Hospital, Neurology Clinic, 08/19/1999, Tr. 243-244**
IMPRESSIONS: Chronic pain unrelieved by two discectomies.

**Preston Memorial Hospital, Neurology Clinic, 07/26/1999, Tr. 245-246**
IMPRESSIONS: Worsening neck and lower back pain, probably from increased activities involved with the search for a job. The pain in the low back has some qualities of radiculopathy but should be managed conservatively at the present time. Also the pain in the neck sounds as if there are impending features of radiculopathy involving the right upper extremity.

**Preston Memorial Hospital, Neurology Revisit, 06/24/1999, Tr. 247**
ASSESSMENT: Chronic neck pain and decreased neck mobility that remain limiting in terms of future occupations. Hopefully he will be able to find a sedentary or light type of work with reasonable reimbursement.

**Preston Memorial Hospital, Preston Physical Therapy and Fitness Center, Tr. 248-275**
GAIT ASSESSMENT: Patient ambulates (?) Antalgic gait pattern 20 (?) L Lip (surgery site) No Cx rotation.
FUNCTIONAL ASSESSMENT: patient reports difficulty (?) 0verhead activities
11/26/1998-11/9/1998- Patient currently rates pain at 7/10. Patient further reports his neck has increased ROM which allows easier turning while driving,
11/30/1998-12/28/1998- Pain rating: Neck- 6/10 now, 6/10 best, 7/10 worst. Back 2/10 now, 3/10 worst, 2/10 best "FEELS GOOD"

4

12/28/1998-1/27/1999- Pain rating: Neck- 6/10 now, 5/10 best, 7/10 worst. Back 2/10 now, 2/10 worst, 1/10 best "I AM GETTING BETTER"
01/27/1999-03/03/1999- Pain rating: Neck- 6/10 now, 5/10 best, 8/10 worst. Back 2/10 now, 4/10 worst, 2/10 best

**Monongalia Physical Therapy, 06/04/1999, Tr. 276-284**
Based on the U.S. Department of Labor definitions for WORK and accompanying physical exertion demand levels, it is this examiner's conclusion that the examinee qualifies for the Light work category within the restricted work plane, provided that the work criteria, as presented are integrated into any return-to-work considerations. When considering the unrestricted vertical and horizontal work planes, the examinee qualifies for the [unspecified] work category.
Hand-Tool Dexterity Test: Percentile-97

**QRS, Dr. Hoffman, 04/15/1999, Tr. 288-294**
DIAGNOSIS: Cervical radiculopathy 5/post discectomy and fusion x2, chronic neck pain & stiffness, low back pain
RESTRICTIONS: no climbing, no use of left arm over hear, no looking up, no lifting over 20 pounds, no prolonged standing

**Preston Memorial Hospital, 03/18/1999, Tr. 316-317**
IMPRESSION: "Mr. Jackson has had cervical diskectomy and fusion at two levels and will be permanently limited in terms of his neck extension. It will not be possible for him to return to tree climbing which involves a considerable amount of neck extension.

**Preston Memorial Hospital, Tr. 442-443**
DIAGNOSIS: Atypical Chest Pain

D. <u>Testimonial Evidence</u>

1. Claimant

Testimony was taken at the hearing from Claimant, who testified as follows (Tr. 501-535):

    Q    Do you have any numbness at all in your left arm and hand now?

    A    No. Just certain times, certain way I move my neck or a certain way I lay, or something. Then I can get it.

    Q    Okay. Is that - - do you know what, what motions will create the numbness in your left arm?

A      Looking up and looking to the left.

*      *      *

Q      Okay. Well, let's, let's talk about the symptoms from your neck that you suffer from now. Where is the pain located now?

A      It's right behind my ear, it comes down right in the shoulder, right in there, right in the back of my arm.

Q      On the left side?

A      Yeah.

Q      That's really not changed much?

A      No.

Q      If you're going to rate that pain on a scale of one to ten, where would you put that?

A      Eight.

Q      And does it, does that pain come and go?

A      No. It stays there.

*      *      *

Q      Where is the pain in your low back?

A      It's all the way across the bottom of the lumbar. In my right hip and down my right leg.

Q      Now, does that pain come and go?

A      No. It's there all the time.

Q      Does the right hip and leg pain come and go?

A       No, it's there all the time.

Q       If you're going to compare now today, the severity of your neck pain versus your back pain. Which one, which one is worse?

A       My back. I mean, they're both pretty bad. But I mean, I, I like to be able to walk and stuff.

Q       Now, do you have times when your low back pain is worse than others?

A       Oh, yeah.

Q       And what, what will bring that - - those worse times on?

A       Well, I don't know if it's the way I have to sleep sometimes or if it's because of the rain or what it is. But sometimes it's severe to where I can't even move, I can't get up. It takes my breath.

Q       How often does that happen that it's that bad?

A       Oh, at least once every two weeks, or maybe twice every two weeks.

Q       And how long does it last at that level?

A       Oh, at that level, at least five days.

Q       And what do you - - are you able to walk?

A       Yeah. Barely. Like I say, every time I move it just like it sucks all the air out of my lungs for some reason or something. I don't know. But, yes, it's - -

Q       Now, do you have any numbness in your right leg?

A       Just sometimes it goes down the back leg. And in towards the groin area.

Q       And do you have any weakness in that leg?

A       Yeah.

Q	How do you, how do you notice the weakness?

A	Oh, because I can't put my hardly none of my weight on it.

*     *     *

Q	Can you hold your head up, up straight?

A	No. If I do it makes this arm really hurt. Say see if I try to raise it straight, or look up or to the left. Just looking that little bit to the left right there really hurts.

Q	It causes the arm pain?

A	Yeah. And the shoulder pain.

*     *     *

Q	Are you - - do you do any of the household chores?

A	I don't do nothing. She does everything. My son was the one that - - but now that he's gone, she has to do it all.

*     *     *

Q	Do you do - - do you help with any of the laundry?

A	No.

Q	Do you cook?

A	No.

*     *     *

Q	Now do you - - how long - - do you do any of the outside chores?

A	No.

Q	How long has it been since you've done any of those?

A	Since I got hurt.

\* \* \*

Q      Do you read?

A      No, I can't concentrate long enough to read.

Q      Do you get a paper, newspaper?

A      No.

Q      What kinds of - - did you used to read?

A      I used to read a newspaper. I used to read to my kids. But I just can't concentrate no more on that.

\* \* \*

Q      How many pounds do you think you could lift, Mr. Jackson, back in '99? Oh, you're - - do you have any idea?

A      No, I don't, sir.

Q      What were you lifting around the house, anything?

A      Nothing. I couldn't even lift my grand kids. I would have somebody put them on my lap and just love them.

Q      How much were you typically lying down back then? If you could reflect back?

A      Oh, about the same - -

Q      Is it about the same as you're doing now?

A      Yeah.

Q      And how much would that be yesterday?

A      Well, after I got home from talking with you I went home and laid down. And that's where I laid until I went to bed. So I'd way probably six, eight hours. I mean that's - - I'll

get up and go to the bathroom or get up and go in and get me something to drink. But I always end up right back on the couch. I'll try anything for relief.

## 2. Vocational Expert

Testimony was taken at the hearing from Vocational Expert, who testified as follows (Tr. 535-540):

Q      Please describe Mr. Jackson's work as a tree trimmer and security guard?

A      The tree trimmer is classified as heavy, semiskilled work by the DOT. The night security guard is light, semiskilled with an SVP of three.

Q      Please assume a younger individual with a high school education, precluded for performing all but sedentary work, with a sit/stand option. No hazards, such as dangerous and moving machinery, unprotected heights. No repetitive bending, or over head reaching. No climbing or walking on uneven ground, unskilled - - strike that. With those limitations, can you describe any work this hypothetical individual can perform?

A      Yes, Your Honor. Those limitation at the sedentary level I got the following jobs. There are surveillance systems monitors, 50 in the local labor market, 15,000 in the nation. There are addressers, 250 local, 100,000 nation. There are inspector, checkers of small products, 150 local, 37,000 nation. And there are waxers of glass products, 160 local, 66,000 nation.

Q      Do those jobs entail extremes of temperature?

A      No, Your Honor.

Q      Vibration?

A      No, Your Honor.

Q      What about the issue if I add only repetitive movements with the neck. If I

restrict this hypothetical individual from repetitively moving his neck. Is that a - - do you have a vocational assessment, nonmedical whether these jobs like monitor, the way - - have you seen this job in fact?

    A    Yes, I have, Your Honor.

    Q    Okay. Do you see the individual working, having to move his head?

    A    Yes. He'd have to watch several monitors, Your Honor, so it would require the ability to look left and right and also slightly up.

    Q    How about the other jobs you named, if that same condition - -

    A    The other jobs basically are performed in front of the person. There would be occasional movement of the neck from, from side to side. But this could be accomplished by moving the whole body if, if need be.

    Q    And that's distinguishable for the monitor job?

    A    Yes.

    Q    Are the jobs you named consistent with the DOT?

    A    They are, Your Honor. The only exception would be there's no mention in the definitions in the DOT of a sit/stand option. The reason I offer these jobs in response to the hypothetical is based on my experience in placing disabled individuals in work for the past 23 years. And these types of jobs typically permit the worker to sit and stand while doing essential duties.

    Q    If a second hypothetical. If I found the claimant's testimony credible regarding his degree of pain, to the extent he has to lie down - -

    ALJ    What did you say yesterday for example, Mr. Jackson? That you lie down

which is typical of since '95? How often?

CLMT        Every day.

ALJ        I mean how often yesterday?

CLMT        Oh, yesterday when I got home?

ALJ        Uh-huh.

CLMT        I laid down until it was bedtime.

ALJ        If I found that credible, even one hour in the A.M., and one hour in the P.M., Mr. Mahler, are those jobs affected?

A        Yes, Your Honor. If that was the case, this individual could not perform competitive employment. You get two 15 minute breaks and a half hour for lunch. And you cannot lie down at any time on the job.

Q        If his pain affected his concentration, the claimant's concentration, where he could not stay on task one-third to two-thirds of the day. Are those jobs affected? Do you mean in hypothetical one?

A        Yes, Your Honor. If that was the case, this person also cannot sustain competitive employment. You have to be on task and functioning independently for at least 85 percent of the work day, sustaining your concentration, persistence and pace, to sustain competitive employment.

ALJ        All right. Ms. Carpenter.

EXAMINATION OF VOCATIONAL EXPERT BY ATTORNEY:

Q        Would decreased - - when I, when I - - let me try that again. The three jobs that you named, the addresser and the inspector and the waxer.

A       Yes, ma'am.

Q       Do those require bimanual dexterity?

A       The waxer would.  Yes.  The addresser if you're able to write with your right hand, you can do that.  It's whatever hand you're involving a hand.  The inspector, checker would require occasional bimanual dexterity.  It could be performed with one hand, because they're small objects.

Q       If you have a decreased grip strength?

A       In either hand?

Q       And actually in this case it's in both hands.

A       Uh-huh.

Q       Left worse than then, than the right.  And I don't know if you're familiar with the - - for instance this says the description for two out of the five.

A       And that's what?

Q       The right hand is four out of five.  Is there - - are there findings.  But would that - - would decreased grip strength - -

A       Uh-huh.

Q       - - to that level, does that affect the pace that a person could perform these jobs at?

A       It could at four out of five in the right hand.  Which is his dominant hand.  It would be minimal but if he had diminished grip strength in both hands to the degree indicated it could affect his ability to use his hands and stay competitive.  Yes.

Q       But these, these jobs are fairly production oriented.

13

A      They're repetitive, they're repetitive - - yeah. They are somewhat quotas involved with these.

E.      Lifestyle Evidence

The following evidence concerning Claimant's lifestyle was obtained at the hearing and through medical records. The information is included in the report to demonstrate how Claimant's alleged impairments affect his daily life.

- Smokes one pack a day. (Tr. 508).

- Can sit in a straight chair: 10-15 minutes. (Tr. 521).

- Can stand with his cane, with his weight primarily on his left leg: 15-20 minutes. (Tr. 522).

- Can walk (4-5 breaks): 100 feet. (Tr. 523).

- Watches television. (Tr. 528).

- Can lift 10-15 pounds with his right hand. (Tr. 534).

### III. The Motions for Summary Judgment

A.      Contentions of the Parties

Claimant contends that the ALJ's decision is not supported by substantial evidence. Specifically, Claimant asserts that the ALJ erred in failing to call a medical expert to the hearing, as was required by Order of the Appeals Councils, for a full and informed listings evaluation.

Commissioner maintains that the ALJ's decision was supported by substantial evidence. Specifically, Commissioner contends that the ALJ obtained medical expert evidence, as was ordered by the Appeals Council.

B.      The Standards.

1.      Summary Judgment.  Summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show there is no genuine issue as to material fact and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  The party seeking summary judgment bears the initial burden of showing the absence of any issues of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).  All inferences must be viewed in the light most favorable to the party opposing the motion. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).  However, "a party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials of [the] pleading, but...must set forth specific facts showing that there is a genuine issue for trial." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986).

2.      Judicial Review.  Only a final determination of the Commissioner may receive judicial review.  See 42 U.S.C. §405(g), (h); Adams v. Heckler, 799 F.2d 131,133 (4th Cir. 1986).

3.      Social Security - Medically Determinable Impairment - Burden. Claimant bears the burden of showing that she has a medically determinable impairment that is so severe that it prevents her from engaging in any substantial gainful activity that exists in the national economy.  42 U.S.C. § 423(d)(1), (d)(2)(A); Heckler v. Campbell, 461 U.S. 458, 460 (1983).

4.      Social Security - Medically Determinable Impairment.  The Social Security Act requires that an impairment, physical or mental, be demonstrated by medically acceptable clinical or laboratory diagnostic techniques.  42 U.S.C. § 423(d)(1), (3); Throckmorton v. U.S. Dep't of Health and Human Servs., 932 F.2d 295, 297 n.1 (4th Cir. 1990); 20 C.F.R. §§ 404.1508, 416.908.

5.      Disability Prior to Expiration of Insured Status- Burden. In order to receive disability insurance benefits, an applicant must establish that she was disabled before the expiration of her

15

insured status.  Highland v. Apfel, 149 F.3d 873, 876 (8th Cir. 1998) (citing 42 U.S.C. §§ 416(i), 423(c); Stephens v. Shalala, 46 F.3d 37, 39 (8th Cir.1995)).

  6. <u>Social Security - Standard of Review</u>.  It is the duty of the ALJ, not the courts, to make findings of fact and to resolve conflicts in the evidence.  The scope of review is limited to determining whether the findings of the Secretary are supported by substantial evidence and whether the correct law was applied, not to substitute the court's judgment for that of the Secretary.  Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990).

  7. <u>Social Security - Scope of Review - Weight Given to Relevant Evidence</u>.  The Court must address whether the ALJ has analyzed all of the relevant evidence and sufficiently explained his rationale in crediting certain evidence in conducting the "substantial evidence inquiry."  Milburn Colliery Co. v. Hicks, 138 F.3d 524, 528 (4th Cir. 1998). The Court cannot determine if findings are unsupported by substantial evidence unless the Secretary explicitly indicates the weight given to all of the relevant evidence.  Gordon v. Schweiker, 725 F.2d 231, 235-36 (4th Cir. 1984).

  8. <u>Social Security - Substantial Evidence - Defined</u>.  Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.  Substantial evidence consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance.  Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996) (citations omitted).

  9. <u>Social Security - Sequential Analysis</u>.  To determine whether Claimant is disabled, the Secretary must follow the sequential analysis in 20 C.F.R. §§ 404.1520, 416.920, and determine: 1) whether claimant is currently employed, 2) whether she has a severe impairment, 3) whether her impairment meets or equals one listed by the Secretary, 4) whether the claimant can perform her past work; and 5) whether the claimant is capable of performing any work in the national economy.  Once

claimant satisfies Steps One and Two, she will automatically be found disabled if she suffers from a listed impairment. If the claimant does not have listed impairments but cannot perform her past work, the burden shifts to the Secretary to show that the claimant can perform some other job. Rhoderick v. Heckler, 737 F.2d 714-15 (7th Cir. 1984).

complete record." Clark v. Shalala, 28 F.3d 828, 830-31 (8th Cir. 1994).

      10.     Social Security - Non-treating physician. It is the duty of the ALJ, not the courts, to make findings of fact and resolve conflicts in the evidence. Hayes v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). The scope of review is limited to determining whether the findings of the Commissioner are supported by substantial evidence and whether the correct law was applied, not to substitute the Court's judgment for that of the Commissioner. Id.

C.    Discussion

The sole issue raised by Claimant in this case is whether the ALJ erred because he failed to call a medical expert to the hearing. The Commissioner contends that the ALJ properly obtained medical expert evidence in accordance with the Appeals Council's order.

It is the duty of the ALJ, not the courts, to make findings of fact and resolve conflicts in the evidence. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). The scope of review is limited to determining whether the findings of the Commissioner are supported by substantial evidence and whether the correct law was applied, not to substitute the Court's judgment for that of the Commissioner. Id.

Although the ALJ is required to indicate the weight given to all relevant evidence, Gordon v. Schweiker, 725 F.2d 231 (4th Cir. 1984), the Fourth Circuit does not require that the ALJ

17

discuss every piece of evidence.[5]  It has been repeatedly recognized that the ALJ's "duty of explanation is not intended to be a mandate for administrative verbosity or pedantry.  If a reviewing court can discern 'what the ALJ did and why he did it,' the duty of explanation is satisfied."  Piney Mountain Coal Co. v. Mays, 176 F.3d 753, 762 n. 10 (4th Cir. 1999) (citing Lane Hollow Coal Co. v. Director, OWCP, 137 F.3d 799, 804-805 (4th Cir. 1998)).  Therefore, this Court must examine the record to determine whether there is substantial evidence for the ALJ's decision.  As was stated above, the Court will not re-weigh or reappraise that evidence.

In the instant case, the Appeals Council ordered that the ALJ was "to obtain evidence from a medical expert" to clarify the nature and severity of Plaintiff's impairments.  (Tr. 51).  The Court agrees with the Commissioner's interpretation that the ALJ did, in fact, comply with the Appeals Council order by arranging a consultative examination with Dr.  Rodolfo Gobunsuy on October 15, 2002.  However, in his decision, the ALJ failed to mention Dr. Gobunsuy's report or cite to the corresponding Exhibit No. (14F).  The ALJ failed to mention whether he credited or discredited Dr. Gobunsuy's opinion.  Nor did he give an explanation as to why he credited or discredited this relevant evidence.  Because the ALJ failed to discuss this relevant evidence, the Court is left to guess at the ALJ's decision making process.  Because the court cannot engage in a guessing game, it is recommended the case be REMANDED.  If remanded, the Court asks the

---

[5] The Undersigned notes that the Seventh Circuit has held that a written evaluation of every piece of evidence is not required, as long as the ALJ articulates at some minimum level her analysis of a particular line of evidence. See Green v. Shalala, 51 F.3d 96, 101 (7th Cir.1995).  Also, the Eighth Circuit has held that the ALJ's mere failure to cite specific evidence does not establish that the ALJ failed to consider it.  Black v. Apfel, 143 F.3d 383, 386 (8th Cir.1998).  See also, Walker v. Secretary of Health and Human Services, 884 F.2d 241, 245 (6th Cir.1989)(reviewing court many examine all the evidence, even if it has not been cited in the Secretary's decision).

ALJ to explain his position with regard to Dr. Gobunsuy's opinion, so that the Court is not left in the difficult position of attempting to review the ALJ's factual findings without any understanding of how he reached them.

## IV. Recommendation

For the foregoing reasons, I recommend that Claimant's Motion for Summary Judgment be DENIED and that the Commissioner's Motion for Summary Judgment be DENIED and that the case be REMANDED. If remanded, the ALJ shall provide a review of Dr. Gobunsuy's report and provide reasoning for his ultimate factual findings in this regard.

Any party who appears *pro se* and any counsel of record, as applicable, may, within ten (10) days after being served with a copy of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection. A copy of such objections should be submitted to the District Court Judge of Record. Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation.

The Clerk of the Court is directed to provide a copy of this Report and Recommendation to parties who appear *pro se* and all counsel of record, as applicable, as provided in the Administrative Procedures for Electronic case Filing in the Unites States District Court for the Norther District of West Virginia.

DATED: January 5, 2006

/s/ James E. Seibert
JAMES E. SEIBERT
UNITED STATES MAGISTRATE JUDGE